**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHERMAN COTTON, as Independent Executor of the Estate of Loy E. King, Jr. and Trustee of the Loy E. King, Jr. Living Trust, as amended | ) ) ) ) ) | U.S. DISTRICT COURT **DOCKETED** JAN 1 5 2003 |
| Plaintiff, | ) ) | Case No. 01 C 1099 |
| v. | ) ) | Judge Ronald Guzman |
| THE PRIVATEBANK AND TRUST COMPANY, an Illinois corporation, et al., | ) ) ) | Magistrate Judge Morton Denlow |
| Defendants, | ) ) | |
| v. | ) ) | |
| CREWS & ASSOCIATES, INC., an Arkansas corporation, et al. | ) ) ) | |
| Third Party Defendants, | ) ) | |
| v. | ) ) | |
| BDO SEIDMAN, LLP, | ) ) | |
| Fourth Party Defendant. | ) | |

**FILED**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT
JAN 1 4 2003

## NOTICE OF FILING

TO:     See Attached Service List

PLEASE TAKE NOTICE that on January 14, 2003, Lewis, Rice and Fingersh, L.C. filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, at 219 South Dearborn Street, Chicago, Illinois, the attached Lewis, Rice and Fingersh, L.C.'s Answer and Affirmative Defenses to PrivateBank's Second Amended Third Party Complaint, a copy of which is hereby served upon you.

120

LEWIS, RICE AND FINGERSH, L.C.

By: _____
        One of Its Attorneys

Jeffrey D. Colman
Gregory M. Boyle
Thomas P. Monroe
JENNER & BLOCK, LLC
330 N. Wabash, Suite 4200
Chicago, Illinois 60611
(312) 222-9350


Dated: January 14, 2003

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SHERMAN COTTON, as Independent Executor of the Estate of Loy E. King, Jr. and Trustee of the Loy E. King, Jr. Living Trust, as amended, | ) ) ) ) ) |
| Plaintiff, | ) ) Case No. 01 C 1099 |
| v. | ) ) Judge Ronald Guzman ) |
| THE PRIVATEBANK AND TRUST COMPANY, an Illinois corporation, et al., | ) ) Magistrate Judge Morton Denlow ) |
| Defendants, | ) ) ) |
| v. | ) ) ) |
| CREWS & ASSOCIATES, INC., an Arkansas corporation, et al., | ) ) ) |
| Third Party Defendants, | ) ) |
| v. | ) ) ) |
| BDO SEIDMAN, LLP, | ) ) ) |
| Fourth Party Defendant. | ) |

**DOCKETED**

JAN 1 5 2003

*FILED*
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT
JAN 1 4 2003

### LEWIS, RICE AND FINGERSH, L.C.'S ANSWER AND
### AFFIRMATIVE DEFENSES TO SECOND AMENDED THIRD PARTY COMPLAINT

Lewis, Rice and Fingersh, L.C. ("Lewis Rice"), by its attorneys, hereby answers PrivateBank

and Trust Company's ("PrivateBank") Second Amended Third Party Complaint as follows:

### The Parties

1.     PrivateBank is an Illinois corporation with its principal place of business in Chicago, Illinois.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

120

as to the truth of the allegations contained in paragraph 1.

2.      Crews & Associates, Inc. ("Crews") is an Arkansas corporation with its principal place of business in Little Rock, Arkansas. Crews is, and at all relevant times has been, a securities broker-dealer registered with the Securities and Exchange Commission and a member, *inter alia*, of the National Association of Securities Dealers. Crews is duly registered and licensed as a securities broker-dealer in the State of Illinois.

        **Answer:**      Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 2.

3.      CIBC World Markets Corp. ("CIBC"), formerly known as Oppenheimer & Co., is a Delaware corporation with its principal place of business in New York, New York. CIBC is, and at all relevant times has been, a securities broker-dealer registered with the Securities and Exchange Commission and a member, *inter alia*, of the National Association of Securities Dealers and New York Stock Exchange. CIBC is duly registered and licensed as a securities broker-dealer in the State of Illinois.

        **Answer:**      Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 3.

4.      SBU, Inc. ("SBU") is or was a Missouri corporation with its principal place of business in St. Louis, Missouri. On information and belief, SBU has been administratively dissolved by the State of Missouri.

        **Answer:**      Lewis Rice admits that SBU, Inc. ("SBU") is or was a Missouri

corporation with its principal place of business in St. Louis, Missouri. Lewis Rice lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations contained in

paragraph 3.

5.      Flag Finance Corporation ("Flag") is or was a Missouri corporation with its principal place of business in St. Louis, Missouri. On information and belief, Flag has been administratively dissolved by the State of Missouri.

        **Answer:**      Lewis Rice admits that Flag Finance Corporation ("Flag") is or was

a Missouri corporation with its principal place of business in St. Louis, Missouri. Lewis Rice lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 5.

6.      James R. Gibson ("James Gibson") is or was a citizen of the State of Missouri. James Gibson currently is in the custody of the federal government. James Gibson is or was an owner, officer and/or principal of SBU and Flag. James Gibson also is or was an incorporator, owner, member, officer and/or principal of an entity known as Family Company of America. L.C. ("Family Company").

**Answer:**      Lewis Rice admits that James Gibson currently is in the custody of the federal government. Lewis Rice admits that James Gibson is or was an owner of SBU and Flag. Lewis Rice admits that James Gibson is or was the president of SBU and Flag. Lewis Rice admits that James Gibson is or was a member, chief executive officer, and/or chairman of the board of Family Company. Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 6.

7.      Marjorie Gibson ("Marjorie Gibson") is or was a citizen of the State of Missouri. On information and belief, Marjorie Gibson is the wife of James Gibson. Marjorie Gibson's current whereabouts are unknown. Marjorie Gibson is or was an owner, officer, employee and/or principal of SBU and Flag.

**Answer:**      Lewis Rice admits that Marjorie Gibson is or was the wife of James Gibson. Lewis Rice lacks knowledge or information sufficient to form a belief as the truth of the remaining allegations contained in paragraph 7,

8.      Jacquelyne Gibson ("Jacquelyne Gibson") is or was a citizen of the State of Missouri. On information and belief, Jacquelyne Gibson is the daughter of James Gibson and Marjorie Gibson. Jacquelyne Gibson's current whereabouts are unknown. Jacquelyne Gibson is or was an owner, officer, employee and/or principal of SBU and Flag.

**Answer:**      Lewis Rice admits that Jacquelyne Gibson is the daughter of James Gibson. Lewis Rice admits that Jacquelyne Gibson is or was an employee of SBU and Flag. Lewis Rice admits that Jacquelyne Gibson is or was the treasurer of SBU. Lewis Rice lacks knowledge or

-3-

information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 8.

9.      Charles Lehnbeuter ("Lehnbeuter") is a citizen of the State of Missouri.  He is a former employee and agent of James Gibson, Family Company, CIBC and of SBU.  Lehnbeuter also served as an incorporator, owner, member, director, officer and/or employee of Family Company, along with James Gibson, both during a period of time of his employment at CIBC and after.

**Answer:**      Lewis Rice admits that Lehnbeuter is or was a former employee of Family Company and CIBC.  Lewis Rice admits that Lehnbeuter is or was a member, the chief financial officer and/or executive vice-president, vice-chairman of the board, treasurer and/or secretary of Family Company.  Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 9.

10.      Lewis, Rice & Fingersh, L.C. ("Lewis Rice"), is a Missouri limited liability company with its principal place of business in St. Louis.  Lewis Rice is a law firm and, at all relevant times, has been in the business of supplying information for the guidance of others in their business transactions.

**Answer:**      Lewis Rice admits that it is a Missouri limited liability company with its principal place of business in St. Louis.  Lewis Rice admits that it is a law firm.  Lewis Rice admits that it provides legal advice to its clients.  Lewis Rice denies the remaining allegations contained in paragraph 10.

11.      This Court has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1332(a), in that the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

**Answer:**      Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 11.  Further answering, Lewis Rice does not contest this Court's jurisdiction over the original action.

12.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events and omissions giving rise to the claim occurred here.

-4-

**Answer:** Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12. Further answering, Lewis Rice does not contest that venue is proper in this judicial district.

13. On or about February, 16, 2001, Sherman Cotton, as Independent Executor of the Estate of Loy E. King, Jr. and Trustee of the Loy E. King, Jr. Living Trust, as amended ("Plaintiff"), filed a Complaint relating to losses alleged to have been suffered by Plaintiff in the form of missed payments due under a structured settlement arrangement. The Complaint alleges that various acts and omissions of PrivateBank caused Plaintiff's losses. (A copy of Plaintiff's Complaint is attached hereto as Exhibit 1.)

**Answer:** Lewis Rice admits that on or about February 16, 2001, Sherman Cotton, as Independent Executor of the Estate of Loy E. King, Jr. and Trustee of the Loy E. King, Jr. Living Trust, as amended ("Plaintiff") filed a complaint relating to losses alleged to have been suffered by Plaintiff in the form of missed payments due under a structured settlement agreement. Lewis Rice admits that Plaintiff's Complaint alleges that various acts and omissions of PrivateBank caused Plaintiff's losses. Lewis Rice admits that a copy of Plaintiff's Complaint is attached to Private Bank's Second Amended Third Party Complaint as Exhibit 1. Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Plaintiff's Complaint relating to losses alleged to have been suffered by Plaintiff in the form of missed payments due under a structured settlement arrangement or the various acts or omissions of PrivateBank. Lewis Rice denies the remaining allegations contained in paragraph 13.

14. PrivateBank has denied all substantive allegations against it relating to its liability (contract and tort) for the losses allegedly suffered by Plaintiff. (A copy of PrivateBank's Answer, Affirmative Defenses and Counterclaim is attached hereto as Exhibit 2.)

**Answer:** Lewis Rice admits that Private Bank has denied all substantive allegations against it relating to its liability (contract and tort) for the losses allegedly suffered by

Plaintiff. Lewis Rice admits that a copy of PrivateBank's Answer, Affirmative Defenses and Counterclaim is attached to Private Bank's Second Amended Third Party Complaint. Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of PrivateBank's denials of the substantive allegations against PrivateBank relating to its liability (contract and tort) for the losses allegedly suffered by Plaintiff.

15.     The missed payments Plaintiff alleges are owed, stem from a Compromise Settlement Agreement and Complete Release ("Settlement Agreement") Plaintiff's decedent Loy E. King, Jr. ("King"), and certain members of King's family, executed with General Motors Corporation and others ("Texas Defendants") in October 1993, in order to settle a lawsuit Plaintiff filed in Texas state court ("Texas suit") against the Texas Defendants earlier that year. (A copy of the Settlement Agreement is attached to Plaintiff's Complaint as Exhibit A.)

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15.

16.     Among other things, the Settlement Agreement provides for a structured settlement in monthly payments to King over a period of years. The Settlement Agreement further provides that the Texas Defendants could assign their duties and obligations to make such payments to SBU.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 16.

17.     Contemporaneously with the execution of the Settlement Agreement, the Texas Defendants, King and SBU executed an Assignment and Assumption Agreement, whereby SBU agreed to undertake the obligation to make the aforementioned structured settlement payments to King under the terms of the Settlement Agreement. (A copy of the Assignment and Assumption Agreement is attached to Plaintiff's Complaint as Exhibit B.)

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17.

18.     On or about October 22, 1993, PrivateBank and SBU entered into a Trust Agreement (the "Trust Agreement"). (A copy of the Trust Agreement is attached to Plaintiff's Complaint as Exhibit C.)

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 18.

19.     Pursuant to the Trust Agreement, SBU was settlor and sole beneficiary of the structured settlement trust established thereby.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 19.

20.     Pursuant to the Trust Agreement, King was entitled to receive periodic payments over time.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 20.

21.     Pursuant to the Trust Agreement, SBU, by and through James Gibson, transferred U.S. Treasury Stripped Bonds to PrivateBank for the purpose of making the aforementioned periodic payments to King. Those Bonds were purchased by SBU from and through Crews and delivered by Crews to PrivateBank.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 21.

22.     On or about August 23, 1996, at the request and direction of SBU and James Gibson that PrivateBank be removed as trustee, PrivateBank tendered its resignation as trustee of the structured settlement trust established by the Trust Agreement.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 22.

23.     On or about August 26, 1996, SBU appointed Flag and Flag accepted the office of successor corporate trustee of the structured settlement trust under the Trust Agreement.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 23.

24.     As of the date PrivateBank was removed and resigned as trustee, PrivateBank had made all payments then required to have been made to King under the Trust Agreement.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

-7-

as to the truth of the allegations contained in paragraph 24.

25.     Prior to the time SBU removed PrivateBank in favor of Flag, Lewis Rice served as counsel to SBU and to Flag, and, at the same time, served as counsel to Family Company.

**Answer:**     Lewis Rice admits that prior to August 23, 1996, Lewis Rice served as legal counsel to SBU, Flag and Family Company. Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 25.

26.     At all relevant times, Lewis Rice, by and through certain of its individual practicing attorneys, including but not limited to James V. O'Brien and Douglas Hommert, knew of the relationship and connection between SBU and James Gibson and Flag. At all relevant times, Lewis Rice knew and understood that the only business of SBU was the structured settlement business.

**Answer:**     Lewis Rice admits that James V. O'Brien is an individual practicing attorney at Lewis Rice. Lewis Rice admits that Douglas Hommert was an individual practicing attorney at Lewis Rice. Lewis Rice admits that one or more of its lawyers knew that there was a relationship between SBU, James Gibson and Flag. Lewis Rice denies the remaining allegations contained in paragraph 26.

27.     In or about September and October 1995, Lewis Rice advised its clients James Gibson, SBU and Flag, and others, that Flag was duly authorized under Missouri law to serve as trustee under structured settlement trust agreements established by SBU and to hold assets in trust on behalf of SBU.

**Answer:**     Lewis Rice admits that in a letter from Douglas Hommert to James Gibson dated September 27, 1995, Mr. Hommert stated, *inter alia*, that:

> Under Missouri law, any Missouri corporation is qualified to act as a trustee in Missouri. In addition, under Illinois law, a foreign corporation (i.e., a corporation organized in any state other than Illinois) may act as a trustee in Illinois as long as the foreign corporation is authorized to act as a fiduciary in the state of its incorporation. Thus, a Missouri corporation is able to act as a trustee in Illinois.

Lewis Rice admits that on October 26, 1995, Mr. Hommert wrote to Kenneth Hughes, outside

-8-

counsel for Old National Bank:

> In furtherance of our telephone conversation of today, and in response to your letter dated October 25, 1995 to Norman Hall and Don Winton at Crews & Associates, Inc., this is to confirm that our firm represents both SBU, Inc. and Flag Finance Corporation. In a private transaction between SBU, Inc. and Flag Finance Corporation, Flag Finance Corporation has agreed to act as a trustee on behalf of SBU, Inc. Contrary to your statement in your letter, Flag Finance Corporation has the power and authority under Missouri law to act as trustee on behalf of SBU, Inc. and to hold assets in trust on behalf of SBU, Inc. I have discussed the particular facts of this transaction with Mr. Irv Freedoff of the Missouri Division of Finance. As such, First National Bank & Trust Company cannot refuse to transfer the assets in question to Flag Finance Corporation on the grounds of lack of power or authority under Missouri law.
>
> It is my understanding that you will be working with Mr. Thomas Ducey to facilitate the transfer of the assets. If my understanding is incorrect, please let me know. If you have any questions, please do not hesitate to call. Thank you for your help and cooperation in this matter.

Lewis Rice denies the remaining allegations contained in paragraph 27.

28.     Prior to the time SBU removed PrivateBank in favor of Flag, James Gibson and SBU advised Crews that SBU no longer wished to pay various banks and trust companies to act as trustee of structured settlements and, instead, was going to substitute Flag, a Gibson/SBU affiliate, to act as successor trustee in order to save money by keeping trustee fees in-house.

     **Answer:**    Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 28.

29.     On information and belief, Lewis Rice advised James Gibson, based upon a June 1995 court decision involving SBU's structured settlement business, that James Gibson and SBU were entitled to use settlement proceeds paid over to SBU and/or U.S. Treasury Stripped Bonds for any purpose, subject only to SBU's payment obligations to its structured settlement clients; alternatively, Lewis Rice knew that James Gibson held that belief and acquiesced in it.

     **Answer:**    Lewis Rice denies the allegations contained in paragraph 29.

30.    At all relevant times, Lewis Rice was aware of James Gibson's intention to use Flag as trustee or to substitute Flag to act as successor trustee under SBU structured settlement trust agreements.

    **Answer:**    Lewis Rice denies the allegations contained in paragraph 30.

31.    In or about January 1996, Lewis Rice rendered legal advice to James Gibson and SBU as to the form and content of SBU's structured settlement trust agreements. Lewis Rice had advised James Gibson that SBU, since it was the settlor and sole beneficiary of the structured settlement trust agreements, could eliminate the trust vehicle altogether or that SBU could employ itself or another captive, corporate entity to fulfill the corporate trustee function, in order to save money on trustee fees and expenses.

    **Answer:**    Lewis Rice admits that, at Jacquelyne Gibson's request, one of its

attorneys reviewed a draft form Trust Agreement. Lewis Rice admits that on January 30, 1996, its

attorney wrote to Jacquelyne Gibson suggesting changes to the draft form Trust Agreement. Lewis

Rice admits that the letter stated:

> It is my understanding that you have or will be forming an Illinois corporation for the purpose of acting as Trustee under the Trust Agreement. . . . You might want to consider eliminating the trust arrangement altogether since it really adds nothing to the transaction and provides the Plaintiff no further protection than is provided in the Qualified Assignment, Release and Pledge Agreement. If for some reason a trust arrangement is necessary, you might consider qualifying SBU, Inc. as the corporate fiduciary since the only trusts it would be administering are trusts of which it is the sole beneficiary. Fees received by a fiduciary are income taxable whereas assets received by the trust beneficiary are generally not. If SBU, Inc. is the fiduciary, no "fees" need be paid. Thus, it would seem that a layer of income taxation and complexity could be removed from this process.

Lewis Rice denies any remaining allegations contained in paragraph 31.

32.    At all relevant times, Lewis Rice also was aware that SBU's structured settlement trust agreements required that the assets thereof be held in trust for the sole purpose of making period payments to personal injury victims, such as King, who had settled lawsuits.

    **Answer:**    Lewis Rice denies the allegations contained in paragraph 32.

33.     At all relevant times, Crews knew of the relationship and connection between SBU and James Gibson and Flag. Crews was then requested by James Gibson and SBU to hold government securities previously held by various banks and trust companies, including PrivateBank, in trustee safekeeping accounts at Crews.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 33.

34.     Crews initially indicated that it did not hold securities in such accounts like the banks and trust companies, and that it had no established fees for such accounts. After further request by SBU and James Gibson, Crews' broker, Norman Hall, secured the approval of Adron Crews, chairman and founder of Crews, to accept such trust assets into trustee safekeeping accounts at Crews for a specially-determined fee.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 34.

35.     In conjunction with PrivateBank's removal and resignation, SBU, by and through James Gibson and Jacquelyne Gibson, directed PrivateBank to transfer securities to Crews, including U.S. Treasury Stripped Bonds held for the purpose of making periodic payments to King under the Trust Agreement.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 35.

36.     Pursuant to the terms of the trusts and the request of SBU, James Gibson, Jacquelyn Gibson and Flag, PrivateBank transferred bonds previously held for payees, including King, into a trustee safekeeping account at Crews. All bonds transferred by PrivateBank to Crews were transferred with a trustee title designation into a trustee safekeeping account at Crews. Specifically, on or about August 28 and 30, 1996, PrivateBank transferred U.S. Treasury Stripped Bonds to Crews, for credit to Crews' account number 15282, in the name of Flag as trustee for SBU (the "Crews Flag Trustee Account").

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 36.

37.     Crews accepted, in trust, the aforementioned transfer of U.S. Treasury Stripped Bonds from PrivateBank, for credit to the Crews Flag Trustee Account.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 37.

38.     The securities transferred by PrivateBank, and accepted by Crews into the Crews Flag Trustee Account, included U.S. Treasury Stripped Bonds from which periodic payments were to be made to King under the Trust Agreement.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 38.

39.     Although Crews knew that all of the bonds in the Crews Flag Trustee Account were held in trust for the purpose of making periodic payments to personal injury victims who had settled lawsuits, including King, Crews never obtained or reviewed trust documents to determine the nature or extent of any trust powers vested in Flag.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 39.

40.     During the period following PrivateBank's transfer of U.S. Treasury Stripped Bonds to Crews and through at least 1998, Crews, at the request and direction of SBU or Flag, by and through James Gibson or Marjorie Gibson or Jacquelyne Gibson or other employees/agents of SBU or Flag, transferred some bonds to CIBC, for credit to CIBC margin account number 067-21709, in the name of SBU (the "CIBC SBU Margin Account").

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 40.

41.     Such third party transfers by Crews to CIBC were made from the Crews Flag Trustee Account to CIBC into an account without a trustee designation. Such transfers were further made without any attempt by Crews to determine if Flag, as trustee, had trust powers permitting such transfers and further without any attempt to document corporate or trust authority, of the parties to such transfers.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 41.

42.     Such transfers from Crews to CIBC were repeated transfers, often in multi-million dollar amounts, over a several-year period which, on information and belief, totaled $30 to $50 million.

**Answer:** Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 42.

43. The securities transferred by Crews and accepted by CIBC into the CIBC SBU Margin Account, and/or the securities sold by Crews out of the Crews Flag Trust Account, included U.S. Treasury Stripped Bonds from which periodic payments were to be made to King under the Trust Agreement.

**Answer:** Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 43.

44. In addition to transfers out of the Crews Flag Trustee Account which were not permitted by the terms of the trusts, Crews also sold, and bought for its own account, approximately $4 million of unmatured bonds out of such account and improperly remitted the proceeds to SBU in direct contravention of the terms of the trusts, including the King trust.

**Answer:** Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 44.

45. In or about January and February of 1997, James Gibson and SBU asked Norman Hall of Crews to liquidate/sell approximately $4 million of the bonds in the Crews Flag Trustee Account and remit the proceeds to SBU.

**Answer:** Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 45.

46. Norman Hall was concerned about the request from SBU to sell bonds because he knew the Crews Flag Trustee Account was held for Flag, as trustee for SBU, as part of their structured settlement business, and knew the bonds were to be used for making payments to persons such as King and other payees, and that SBU and Flag had never before sought to sell bonds prior to maturity from the Crews Flag Trustee Account. Hall questioned SBU's or Flag's authority to make such sales and raised these known facts with his supervisor, Don Winton. Winton, in turn, raised the authority issues with Crews' president and chairman, who instructed Winton to make inquiries. Notwithstanding Crews', Hall's and Winton's knowledge that only the trust documents would contain information on the trustee's power, if any, to effect such transactions, Crews, which never asked for copies of the trust agreements, permitted sales (to Crews itself) of the unmatured bonds from the trustee safekeeping account without obtaining or reviewing the trust instruments.

**Answer:** Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 46.

47. During the period 1997 through 1999, SBU and Flag, by and through James Gibson, Marjorie Gibson and Jacquelyne Gibson, converted securities (and proceeds therefrom) held by Crews in the Crews Flag Trustee Account and, on information and belief, held by Crews in other accounts (*i.e.*, account numbers 15159, 15160 and 15161) of Flag as trustee for SBU and its related entities, including U.S. Treasury Stripped Bonds held for the purpose of making periodic payments to King under the Trust Agreement, and, on information and belief, used same for their own purpose and benefit.

**Answer:** Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 47.

48. During the period 1997 through 1999, SBU and Flag, by and through James Gibson, Marjorie Gibson and Jacquelyne Gibson, converted securities (and proceeds therefrom) held by CIBC in the CIBC SBU Margin Account, including U.S. Treasury Stripped Bonds held for the purpose of making periodic payments to King under the Trust Agreement, and, on information and belief, used same for their own purpose and benefit.

**Answer:** Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 48.

49. In or about August of 1995, Lehnbeuter, while employed by CIBC, agreed to help James Gibson and SBU convert bonds held in the Crews Flag Trustee Account. James Gibson decided to purchase, by and through Family Company, a chain of supermarkets in St. Louis, Missouri, using the bonds held in trust to finance the purchase. James Gibson purports to have been advised by his counsel (Lewis Rice) and others that use of payee bonds was appropriate since SBU was both settlor and beneficiary of the grantor trusts which held the bonds, including bonds from which payments were to be made to King.

**Answer:** Lewis Rice denies that it advised James Gibson that use of payee bonds, including bonds from which payments were made to King, was appropriate because SBU was both settlor and beneficiary of the grantor trusts which held the bonds. Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 49.

-14-

50.     Lehnbeuter agreed to assist James Gibson in using the bonds to finance the transaction in exchange for Gibson's offer to hire Lehnbeuter as a member, officer, director and/or incorporator of Family Company, the entity, which was to own and operate the supermarkets. James Gibson also agreed to give and/or permit Lehnbeuter to be an equity investor in Family Companies.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 50.

51.     Initially, Lehnbeuter contacted Normal Hall at Crews and sought to obtain Crews' agreement to make a margin loan to SBU or James Gibson based upon the security of bonds held at Crews in the Crews Flag Trustee Account. Crews informed Lehnbeuter that it did not make margin loans to any of its customers.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 51.

52.     Lehnbeuter then secured James Gibson's agreement to transfer bonds into a margin account at CIBC, assuming Lehnbeuter could obtain CIBC's prior approval to extend margin to SBU and James Gibson or to otherwise allow James Gibson to use bonds to finance the purchase and operation of supermarkets by Family Company.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 52.

53.     In or around September to November 1995, Lehnbeuter obtained approval from CIBC and from Richard Fisher, his supervisor at CIBC, for the proposed transaction. Lehnbeuter advised Fisher of the fact that James Gibson wanted to use the margin loan or a repurchase agreement to fund Family Company. Lehnbeuter further advised Fisher and others at CIBC that, if the Family Company's purchase of supermarkets was approved by the FTC and closed with the seller (Schnuck Markets), then he would be leaving CIBC and joining James Gibson and Family Company as an officer and/or director.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 53.

54.     In furtherance of his plan, Lehnbeuter advised Gibson and SBU as to the precise method for achieving a transfer of bonds into a CIBC non-trustee account from the Crews Flag Trustee Account. Lehnbeuter's assistance, combined with Crews' failure to check or question Flag's powers as trustee under the trust instruments, allowed SBU to funnel bonds out of the Crews Flag Trustee Account into the unrestricted SBU margin account at CIBC.

**Answer:**    Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 54.

55.    CIBC permitted the funding of a margin account by SBU at CIBC notwithstanding the knowledge of CIBC management that SBU was a structured settlement company that was in the business of structuring settlements for injury victims who obtained judgments or settlements.

**Answer:**    Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 55.

56.    CIBC permitted the pledging of securities for margin loans notwithstanding their actual knowledge of Lehnbeuter's previously disclosed conflict of interest and involvement in investment banking activities on behalf of SBU and Gibson in attempting to finance the purchase of the supermarkets by Family Company. CIBC knew Lehnbeuter was attempting to transfer in approximately $17 million in government bonds and then immediately pledge or sell $9 million for the supermarket venture he would be joining. CIBC failed to follow industry rules and regulations as well as its own policies and procedures, and failed to supervise Lehnbeuter's activities.

**Answer:**    Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 56.

57.    CIBC permitted large margin loans and large sales of bonds out of the CIBC SBU Margin Account during the time Lehnbeuter was employed by CIBC and well after his disclosed dual role at CIBC and SBU/Family Company.

**Answer:**    Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 57.

58.    The CIBC SBU Margin Account was one of the three largest of the approximately 10,000 accounts in CIBC's main office in St. Louis. CIBC made substantial income from brokerage commissions and interest on margin loans during the period the CIBC SBU Margin Account was maintained at CIBC.

**Answer:**    Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 58.

59.    During the course of maintaining the CIBC SBU Margin Account, CIBC permitted James Gibson and SBU to sell approximately $30 to $50 million worth of bonds with full knowledge that SBU was a structured settlement company that used government bonds to funds settlements and

-16-

further having records showing that neither SBU nor James Gibson had an individual or corporate net worth of such amount.

**Answer:**　　Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 59.

60.　　Lewis Rice represented James Gibson and Family Company in connection with the acquisition of the supermarkets from Schnuck Markets, Inc., and thereafter.

**Answer:**　　Lewis Rice admits the allegations contained in paragraph 60.

61.　　At all relevant times, Lewis Rice knew, or should have known, that James Gibson and Family Company did not have monies of their own sufficient to fund the purchase of the supermarkets. Instead, James Gibson and Family Company had to "borrow" funds in order to consummate the purchase, which it did from SBU.

**Answer:**　　Lewis Rice admits that Family Company borrowed funds from SBU

in connection with Family Company's acquisition of supermarkets from Schnuck Markets, Inc.

Lewis Rice denies the remaining allegations contained in paragraph 61.

62.　　Lewis Rice represented both Family Company and SBU in connection with the "loan" transaction between them whereby SBU agreed to lend Family Company monies and extend credit sufficient for Family Company to consummate the acquisition of the supermarkets from Schnuck Markets, Inc.

**Answer:**　　Lewis Rice admits that it represented both Family Company and SBU

in connection with SBU's agreement to lend Family Company monies and extend credit sufficient

to Family Company in connection with the acquisition of the supermarkets from Schnuck Markets,

Inc. Lewis Rice denies the remaining allegations contained in paragraph 62.

63.　　At all relevant times, on information and belief, Lewis Rice knew, or should have known, that the source of the funds to be used and actually used by SBU, which funds were provided to Family Company in order that Family Company might acquire the supermarkets, was assets and securities received and held by SBU in the course of its structured settlement business, which assets and securities were to be used by SBU for the sole purpose of funding structured settlement obligations to personal injury victims, like King, who had settled lawsuits.

**Answer:**     Lewis Rice denies the allegations contained in paragraph 63 and each

of them.

64.     Lewis Rice, by and through one or more of its individual practicing attorneys, attended meetings with James Gibson and other of his financial advisors, including BDO Seidman and Charles Lehnbeuter, where the source and use of funds for the supermarket acquisition was fully discussed and agreed upon. Lewis Rice further knew, or should have known, of Lehnbeuter's and James Gibson's involvement, as aforesaid, in arranging the transfer of funds to and from CIBC to be used in the acquisition transaction and for purposes of operating the supermarkets once the transaction closed.

**Answer:**     Lewis Rice admits that some of its attorneys attended meetings with

James Gibson, Doug Beckmeyer (BDO Seidman accountant), and Charles Lehnbeuter. Lewis Rice

admits that it discussed with James Gibson, Doug Beckmeyer and Charles Lehnbeuter the financial

requirements of Family Company's acquisition of supermarkets from Schnuck Markets, Inc. Lewis

Rice denies the remaining allegations contained in paragraph 64.

65.     On information and belief, Lewis Rice itself had a vested interest in the consummation of the supermarket acquisition transaction insofar as Lewis Rice agreed to bill James Gibson and Family Company only 70% of its regular hourly rates, pending the closing of the transaction, with the remaining 30% being billed and payable only upon the closing of the transaction.

**Answer:**     Lewis Rice admits that it agreed to bill Gibson and Family Company

70% of its regular hourly rates, pending the closing of the transaction, with the remaining 30%,

comprising approximately $50,000, being payable only upon the closing of the transaction. Lewis

Rice denies the remaining allegations contained in paragraph 65.

66.     Following the closing of the acquisition transaction, Lewis Rice continued to represent Family Company and SBU, in connection with the "loan" transaction from SBU to Family Company and in other matters. At all relevant times, Lewis Rice was aware that Family Company was losing money and that Family Company needed additional infusions of cash to operate the supermarkets, which cash infusions were made by SBU with the use of assets and securities received and held by SBU for the sole purpose of funding structured settlement obligations to personal injury victims, like King, who had settled lawsuits.

-18-

**Answer:** Lewis Rice admits that following Family Company's acquisition of supermarkets from Schnuck Markets, Inc., Lewis Rice represented Family Company, Gibson, and SBU, at various points in time in the following matters: (1) legal services to Family Company regarding discrete labor issues related to the supermarkets acquired from Schnuck Markets, Inc.; (2) legal services to Family Company regarding a lawsuit between Family and Fleming Companies, Inc. styled <u>Fleming Companies, Inc. v. Family Company of America L.C., et al.</u>, No. CIV-99-0052A; (3) legal services to Family Company in an arbitration regarding a dispute between Family Company and Schnuck Markets, Inc. styled <u>Schnuck Markets, Inc. v. Family Company of America L.C.</u>, No. 97-CC-000919-7-CV; (4) legal services to James Gibson and Family Company regarding a lawsuit involving a potential investor in Family Company styled <u>C. Gregory Krekeler v. James Gibson</u>, No. 962-0002; (5) legal services to Family Company regarding two property disputes related to two of the supermarkets from the acquisition of supermarkets from Schnuck Markets, Inc.; and (7) legal services to James Gibson regarding his prospective purchase of Piggly Wiggly stores. Lewis Rice denies the remaining allegations contained in paragraph 66.

67. On information and belief, in or about July 2000, King stopped receiving payments pursuant to the Trust Agreement.

**Answer:** Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 67.

**COUNT I**
**CLAIM FOR CONTRIBUTION AGAINST LEHNBEUTER**

68-105. The allegations in Count I are not directed at Lewis Rice and therefore no answer is required. To the extent that an answer to the allegations in Count I is required, Lewis Rice denies them.

-19-

## COUNT II
## CLAIM FOR CONTRIBUTION AGAINST CIBC

106-140.     The allegations in Count II are not directed at Lewis Rice and therefore no answer is required. To the extent that an answer to the allegations in Count II is required, Lewis Rice denies them.

## COUNT III
## CLAIM FOR CONTRIBUTION AGAINST CREWS

141-169.     The allegations in Count III are not directed at Lewis Rice and therefore no answer is required. To the extent that an answer to the allegations in Count III is required, Lewis Rice denies them.

## COUNT IV
## CLAIM FOR CONTRIBUTION AGAINST LEWIS RICE

170.     PrivateBank repeats and realleges herein the allegations in paragraphs 1 through 169 above as this paragraph 170.

**Answer:**     Lewis Rice repeats and realleges herein its answers to paragraphs 1 through 169 above as its answer to this paragraph 170.

171.     At all times relevant hereto, there existed a valid and enforceable contract by and between SBU and King, as detailed above, whereby SBU was obligated to use U.S. Treasury Stripped Bonds for the sole purpose of making periodic payments to King under the Trust Agreement.

**Answer:**     Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 171.

172.     Lewis Rice was aware of this contractual relationship between SBU and King or, at a minimum, between SBU and persons similarly situated to King.

**Answer:**     Lewis Rice denies the allegations contained in paragraph 172.

173.     Lewis Rice knowingly and purposefully induced, and/or knowingly and voluntarily participated in conduct causing, SBU to breach its contract with King.

-20-

**Answer:**    Lewis Rice denies the allegations contained in paragraph 173.

174.    The tortious conduct that Lewis Rice induced and/or participated in caused or contributed, in whole or in part, to any injury Plaintiff may have suffered.

**Answer:**    Lewis Rice denies the allegations contained in paragraph 174.

175.    Alternatively, at all times relevant hereto, there existed a fiduciary relationship between SBU and King.

**Answer:**    Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 175.

176.    Lewis Rice was aware of this relationship between SBU and King or, at a minimum, between SBU and persons similarly situated to King.

**Answer:**    Lewis Rice denies the allegations contained in paragraph 176.

177.    Lewis Rice knowingly and purposefully induced SBU to engage in conduct, and/or knowingly and voluntarily participated in conduct, that violated SBU's fiduciary duties to King.

**Answer:**    Lewis Rice denies the allegations contained in paragraph 177.

178.    In addition, Lewis Rice knowingly and voluntarily accepted the benefits flowing or expected to flow from the wrongful conduct that it induced or participated in.

**Answer:**    Lewis Rice denies the allegations contained in paragraph 178.

179.    The tortious conduct that Lewis Rice induced, participated in and benefitted from caused or contributed, in whole or in part, to any injury Plaintiff may have suffered.

**Answer:**    Lewis Rice denies the allegations contained in paragraph 179.

180.    Alternatively, at all times relevant hereto, King had a reasonable a expectation of receiving periodic, structured settlement payments under the terms of the Settlement Agreement.

**Answer:**    Lewis Rice lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 180.

181.    Lewis Rice was aware of this expectancy.

-21-

**Answer:** Lewis Rice denies the allegations contained in paragraph 181.

182. Lewis Rice knowingly and purposefully induced, and/or knowingly and voluntarily participated in, conduct that interfered with this expectancy.

**Answer:** Lewis Rice denies the allegations contained in paragraph 182.

183. The tortious conduct that Lewis Rice induced and/or participated in caused or contributed, in whole or in part, to any injury Plaintiff may have suffered.

**Answer:** Lewis Rice denies the allegations contained in paragraph 183.

184. At all relevant times, the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/0.01, *et seq.* (the "Act") has been in effect in Illinois.

**Answer:** Lewis Rice avers that paragraph 184 consists of a legal conclusion to which an answer is neither required nor appropriate.

185. Because PrivateBank and Lewis Rice potentially are subject to liability in tort arising out of the same injury to Plaintiff, there is right of contribution among them, and, for each and all of the above reasons, PrivateBank herein asserts that right as against Lewis Rice pursuant to the Act.

**Answer:** Lewis Rice denies the allegations contained in paragraph 185.

WHEREFORE, Lewis Rice respectfully requests that this Court deny the relief requested in Count IV of Private Bank's Second Amended Third Party Complaint.

## COUNT V
## CLAIM FOR CONTRIBUTION AGAINST FLAG

186-204. The allegations in Count V are not directed at Lewis Rice and therefore no answer is required. To the extent that an answer to the allegations in Count V is required, Lewis Rice denies them.

## COUNT VI
## CLAIM FOR CONTRIBUTION AGAINST SBU, JAMES GIBSON, MARJORIE GIBSON AND JACQUELYNE GIBSON

205-223. The allegations in Count VI are not directed at Lewis Rice and therefore no

-22-

answer is required. To the extent that an answer to the allegations in Count VI is required, Lewis Rice denies them.

## COUNT VII
## CLAIM FOR CONTRIBUTION AGAINST LEHNBEUTER, CIBC, CREWS, LEWIS RICE, SBU, FLAG, JAMES GIBSON MARJORIE GIBSON AND JACQUELYNE GIBSON

224.    PrivateBank repeats and realleges herein the allegations in paragraphs 1 through 223 above as this paragraph 224.

**Answer:**    Lewis Rice repeats and realleges herein its answers to paragraphs 1 through 223 above as its answer to this paragraph 224.

225.    As detailed above, Lehnbeuter, CIBC, Crews, Lewis Rice, SBU, Flag, James Gibson, Marjorie Gibson and Jacquelyn Gibson knowingly and purposely agreed and conspired to pursue the common objective of wrongfully and illegally assuming unauthorized control, dominion and ownership over the U.S. Treasury Stripped Bonds from which payments were to be made to individuals who had settled personal injury lawsuits, including King.

**Answer:**    Lewis Rice denies the allegations contained in paragraph 225.

226.    As detailed above, Lehnbeuter, CIBC, Crews, Lewis Rice, SBU, Flag, James Gibson, Marjorie Gibson and Jacquelyn Gibson also knowingly and purposely agreed and conspired to directly or indirectly induce SBU to engage in conduct that violated SBU's fiduciary duties to King.

**Answer:** Lewis Rice denies the allegations contained in paragraph 226.

227.    In addition, as detailed above, Lehnbeuter, CIBC, Crews, Lewis Rice, SBU, Flag, James Gibson, Marjorie Gibson and Jacquelyn Gibson knowingly and purposely agreed and conspired to pursue the common objective of wrongfully and illegally interfering with King's expectation of receiving periodic, structured settlement payments under the terms of the Settlement Agreement.

**Answer:** Lewis Rice denies the allegations contained in paragraph 227.

228.    CIBC is charged with Lehnbeuter's knowledge and intent, and is liable for Lehnbeuter's wrongful conduct described above, because Lehnbeuter was, at the time of such wrongful conduct, an agent of CIBC and engaged in such wrongful conduct for the benefit, and in his capacity as an agent, of CIBC.

**Answer:** Lewis Rice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 228.

229.     One or more of these Third Party Defendants, either personally or through one or more agents, committed one or more overt acts in furtherance of these conspiracies, as described elsewhere above.

**Answer:** Lewis Rice denies the allegations contained in paragraph 229.

230.     As detailed above, these acts were tortious in nature because they constituted tortious inducement to breach a fiduciary duty owed to King, and tortious interference with King's contractual and economic relationships.

**Answer:** Lewis Rice denies the allegations contained in paragraph 230.

231.     Each of these Third Party Defendants understood the general objectives of the conspiratorial schemes described above, knowingly and voluntarily participated in these schemes and one or more actions taken in furtherance thereof, and knowingly accepted both such objectives and any and all benefits that flowed and that they expected to flow from such schemes.

**Answer:** Lewis Rice denies the allegations contained in paragraph 231.

232.     These tortious conspiratorial agreements, objectives and actions caused or contributed, in whole or in part, to any injury Plaintiff may have suffered.

**Answer:** Lewis Rice denies the allegations contained in paragraph 232.

233.     At all relevant times, the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/0.01, *et seq.* (the "Act"), has been in effect in Illinois.

**Answer:** Lewis Rice avers that the allegations of paragraph 184 consist of a legal conclusion to which an answer is neither required nor appropriate.

234.     Because PrivateBank and Lehnbeuter, CIBC, Crews, Lewis Rice, SBU, Flag, James Gibson, Marjorie Gibson and Jacquelyn Gibson are subject to liability in tort arising out of the same injury to Plaintiff, there is a right of contribution among them, and, for each and all of the above reasons, PrivateBank herein asserts that right as against Lehnbeuter, CIBC, Crews, Lewis Rice, SBU, Flag, James Gibson, Marjorie Gibson and Jacquelyn Gibson pursuant to the Act.

**Answer:** Lewis Rice denies the allegations contained in paragraph 234.

-24-

WHEREFORE, Lewis Rice respectfully requests that this Court deny the relief sought by PrivateBank against Lewis Rice in Count VII of the Second Amended Third Party Complaint.

## AFFIRMATIVE DEFENSES

1. As set forth in Lewis Rice's Motion for Judgment on the Pleadings, pursuant to Fed. R. Civ. P. 12(c), 12(h)(2) and 9(b), which has been filed contemporaneously with this answer and is incorporated into these affirmative defenses by reference, PrivateBank's claims for contribution against Lewis Rice are barred because they are premised entirely on Lewis Rice's provision of legal services to its clients, which are privileged as a matter of law from serving as the basis for third party claims.

2. The legal advice that Lewis Rice provided to SBU, Gibson, Flag and Family Company was an accurate summary of the law as it existed at the time the legal advice was requested and provided.

3. The legal advice that Lewis Rice provided to SBU, Gibson, Flag and Family Company was provided in good faith.

4. Lewis Rice's acts or omissions were not the proximate cause of any alleged damages to Plaintiff or PrivateBank.

5. PrivateBank's claims are barred by the doctrines of waiver, laches and estoppel.

6. PrivateBank cannot recover its alleged damages, if any, because its tortious conduct contributed to the injury of which Plaintiff complaints.

7. To the extent PrivateBank is found liable on Plaintiff's breach of contract claim and not Plaintiff's negligence claim, PrivateBank is not entitled to contribution from Lewis

Rice because the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/0.01, does not apply to breach of contract claims.

8.     To the extent PrivateBank is found liable on Plaintiff's breach of fiduciary duty claim and not Plaintiff's negligence claim, PrivateBank is not entitled to contribution because the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/0.01, does not apply to breach of fiduciary duty claims.

9.     PrivateBank's claims are barred by the applicable statute of limitation and statute of repose.

10.    As set forth in Lewis Rice's Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c), 12(h)(2) and 9(b), which has been filed contemporaneously with this answer and is incorporated into these affirmative defenses by reference, Count VII fails to state a claim upon which relief can be granted because it does not comply with the pleading requirements of Fed. R. Civ. P. 9(b).

Lewis Rice demands trial by jury on all claims so triable.

Respectfully submitted,

LEWIS, RICE & FINGERSH, L.C.

By: _____
One of Its Attorneys

Jeffrey D. Colman
Gregory M. Boyle
Thomas P. Monroe
JENNER & BLOCK, LLC
330 N. Wabash, Suite 4200
Chicago, IL 60611
(312) 222-9350
Dated: January 14, 2003

-26-

**CERTIFICATE OF SERVICE**

Gregory M. Boyle, an attorney, hereby certifies that he caused copies of the

foregoing Notice of Filing and Lewis, Rice & Fingersh, L.C.'s Answer to PrivateBank's Second

Amended Third Party Complaint, to be served upon all persons listed on the attached Service

List via facsimile and first class mail this 14th day of January, 2003.

Gregory M. Boyle

## SERVICE LIST

David L. Doyle
James V. Garvey
Vedder, Price, Kaufman & Kammholz
222 North LaSalle Street
Chicago, IL 60601
Tel: (312) 609-7782
Fax: (312) 609-5005

Terrence E. Leonard
100 West Monroe Street
Suite 1310
Chicago, IL 60603
Tel: (312) 263-4604
Fax: (312) 263-0182

David M. Allen
Jeffrey E. Schiller
Rachel T. Nguyen
Schuyler, Roche & Zwirner, P.C.
130 E. Randolph St., Suite 3800
Chicago, IL 60601
Tel: (312) 565-2400
Fax: (312) 565-8300

Cathie Schroeder
Thompson Coburn LLP
One US Bank Plaza
St. Louis, MO 63101
Tel: (314) 552-6242
Fax: (314) 552-7242

Larry W. Burks
Friday, Eldredge & Clark
2000 Regions Center
400 West Capitol
Little Rock, AR 72201
Tel: (501) 376-2011
Fax: (501) 376-2147

Donald B. Hilliker
Derek J. Meyer
McDermott, Will & Emery
227 West Monroe Street
Chicago, IL 60606
Tel: (312) 984-7610
Fax: (312) 984-7700

Michael S. Poulos
Charles Lynn Lowder
Amy Collins
Piper Rudnick
203 North LaSalle Street
Suite 1800
Chicago, IL 60601-1292
Tel: (312) 368-4075
Fax: (312) 236-7516

Paul, J. Puricelli
Stone, Leyton & Gershman
7733 Forsyth Boulevard
Suite 500
St. Louis, MO 63105
Tel: (314) 721-7011
Fax: (314) 721-8660

Doc#879968v1

4